**UNITED STATES, Petitioner,**

v.

**Colonel J. Jeremiah MAHONEY,
Military Judge, Respondent.**

Misc.Dkt. No. 92–06.
Panel No. 4.

U.S. Air Force Court of Military Review.

28 Sept. 1992.

Naomi D. Allen TSgt, USAF Chief Court Administrator, AFCMR.

Before LEONARD, JAMES, and MCLAUTHLIN, Appellate Military Judges.

## OPINION OF THE COURT

LEONARD, Senior Judge:

This case is about a conflict between the power of a commander and the authority of a military judge. It explores the authority of a military judge to respond, after completion of a trial, to a commander's willful disregard of a judicial order. The United States, in a petition for extraordinary relief, asks that we issue a writ of prohibition ordering a military judge to desist from any further involvement in this case. They also request we declare the judge's post-trial session and "Final Order on Willful Unlawful Command Influence" null and void. We decline to grant any of the relief requested.

## I. FACTS.

From 11 to 14 March 1992, a general court-martial tried Staff Sergeant Tilghman at Royal Air Force Base, Bentwaters, United Kingdom, for rape, two assaults with intent to inflict grievous bodily harm, assault consummated by a battery, a false claim for housing allowances, and adultery. On the evening of 13 March, court members found Tilghman guilty of the offenses as charged, except for the assaults with intent to inflict grievous bodily harm. They entered findings of guilty to lesser included offenses of these offenses.

After the verdict, Colonel Long, the Bentwaters support group commander, ordered Tilghman into confinement for the evening of 13 March. A few minutes after the court-martial had recessed, the military judge, Colonel McShane, reconvened in a session without court members to address Colonel Long's confinement order. The defense counsel asked the military judge to review the need for confining Tilghman and to order Tilghman's release. The military judge agreed to review the propriety of Tilghman's confinement. In his review under R.C.M. 305(j), Judge McShane consid-ered three sources of information bearing on the need to confine Tilghman.

First, the government stated its reasons for confinement: Tilghman's conviction of crimes allowing for a maximum punishment of life in prison, the possibility of threats to Tilghman's emotional well-being from the convictions, and the likelihood he would flee. The military judge offered the government the opportunity to introduce further evidence to support confining Tilghman, but the trial counsel declined.

Second, Judge McShane considered evidence presented during litigation of preliminary motions and during the findings portion of the trial. This included a mental health evaluation and testimony concerning a depression Tilghman suffered after his separation from the complaining witness. It also included about 150 pages of testimony from the complaining witness about the alleged crimes, Tilghman's contacts with her after she made her accusations, and that Tilghman's last contact with her had been over 9 months before trial. The testimony about Tilghman's last contacts with the complaining witness came just before review of the confinement order.

Third, Judge McShane questioned Tilghman about his reaction to the trial proceedings and convictions, his intentions to be present for the remainder of the trial, and his mental state. Judge McShane also obtained promises from Tilghman not to contact the complaining witness and to appear at the trial the next morning.

After considering all this information, Judge McShane ordered Tilghman released from confinement under the authority granted him by R.C.M. 305(g) and (j). Before doing so, Judge McShane stated several findings and conclusions.

First, he addressed the likelihood Tilghman would flee. He stated Tilghman had been charged with all the tried offenses since 2 October 1991 (the trial began on 11 March 1992) and had not attempted to flee and had appeared promptly at each trial session. Second, he noted that Tilghman had not contacted the complaining witness

since the previous summer and there were no new allegations that he had engaged or would engage in intimidation of witnesses, obstruction of justice, or other criminal misconduct that would pose a serious threat to the safety of the community or the effectiveness, morale, discipline, readiness, or safety of the command or the national security of the United States. Third, he found that the event of Tilghman's conviction was not a shocking or unexpected event like that causing Tilghman's earlier mental depression and there was no present concern for Tilghman's mental health. Fourth, he found there was nothing to show that it was foreseeable that Tilghman would not appear at the remainder of the trial, or engage in serious criminal misconduct.

Almost immediately after adjournment, Colonel Long issued another confinement order countermanding the military judge's release order. Colonel Long's later statements to an inquiry officer reveal that he took this action because he thought the military judge's decision was "obviously wrong." Colonel Long stated he believed he had a better grasp of the case than the military judge and that the military judge was not fully aware of: the implications of Tilghman's conviction of serious offenses warranting a maximum punishment of life in prison, the probability of Tilghman fleeing, the possible danger that Tilghman might present to himself and others, and Tilghman's mental health. Colonel Long also stated he questioned the authority of a military judge to countermand the confinement order of a base commander.

Upon Colonel Long's order, a base-wide search ensued for Tilghman. British police finally apprehended him at his off base residence. When his counsel learned of the new order to confine, they asked the Air Force security police and staff judge advocate's office to contact them when Tilghman arrived at the base confinement facility. Although British police apprehended Tilghman near Bentwaters at 10:20 p.m., Air Force security police did not return him to the base until after midnight. He was not made available to his defense counsel before they retired at 1 a.m.

The next morning Tilghman's defense counsel asked the military judge to order administrative credit for illegal confinement served by their client. Before ruling on the defense motion, Judge McShane made findings of fact. He found no discovery of new evidence or misconduct justifying Colonel Long ordering Tilghman back into confinement after a release order by a military judge.[1] He also found the action by Colonel Long an abuse of authority and power. Finding the resulting confinement illegal, he ordered a credit of 10 days for the day of illegal confinement. The court-martial then adjourned on 14 March 1992.

After adjournment, Colonel McShane completed a Judge's Case Summary Report of Tilghman's trial. He sent a copy of that report to Judge Mahoney, the Chief Circuit Military Judge for the Air Force Sixth Judiciary Circuit. He also called Judge Mahoney and gave him a report on the case and the confinement issue. On 17 March 1992, Judge Mahoney wrote the Commander of Third Air Force, the convening authority for Tilghman's court-martial, expressing his concern about Colonel Long's action and the appearance "of a commander ignoring or flouting the law and acting contrary to a judicial determination." Judge Mahoney recommended that the convening authority appoint a senior officer to inquire into the facts and recommend appropriate action.

---

1. Colonel Long's Pretrial Confinement Memorandum, completed 6 days after the end of Tilghman's trial, supports the military judge's finding. The purpose of this memorandum was to set forth Colonel Long's rationale for ordering Tilghman into confinement despite the military judge's order releasing him. However, that memorandum did not include any information supporting the confinement decision that would have been unknown to the military judge when he ordered Tilghman released. Colonel Long relied primarily upon information provided by Master Sergeant Magana (Tilghman's supervisor), Doctor Campbell (Tilghman's mental health counselor), and the victim. All three testified before the military judge during motion hearings, findings, and sentencing before the military judge made his decision to release Tilghman.

On 23 March 1992, the convening authority appointed an inquiry officer to look into the matters raised in Judge Mahoney's letter. The inquiry officer completed his interviews of witnesses on 25 March 1992 and sent his report to the convening authority on an unknown date.

Having been informed that an inquiry was underway, but receiving no further report, Judge Mahoney sent a letter dated 13 April 1992 requesting the status of the inquiry. On 16 April 1992, the staff judge advocate of Third Air Force replied stating the inquiry had been conducted but the convening authority had not yet decided to release it. Judge Mahoney sent another letter to the convening authority on 21 April 1992, informing him of Mahoney's responsibility as chief judge of the Sixth Judiciary Circuit to preserve the overall integrity of military justice in the circuit. In this letter, Mahoney stressed the need to determine whether there had been willful, improper or illegal action by Colonel Long and to make the results of that determination available so any necessary corrective action could be taken. Just before sending the 21 April letter, Judge Mahoney received a copy of a letter the Air Force Judge Advocate General sent to all staff judge advocates. That letter forwarded a Senate report concerning unlawful command influence in the Army's 3rd Armored Division and emphasized the importance of preserving the fundamental fairness of military justice by addressing and quickly correcting any unlawful command influence issues.

After receiving no reply to his 21 April letter, Judge Mahoney, in a letter dated 29 April, detailed himself to the Tilghman court-martial and directed the convening of a post-trial session on 6 May 1992. Mahoney's stated purpose for the session was to allow trial counsel to present evidence to establish that the government did not willfully flout the law in re-confining Tilghman. He also invited trial counsel to present evidence on any corrective action taken and to show cause why further relief, prophylactic or compensatory, should not be granted.

On 1 May 1992, the convening authority's staff judge advocate sent a letter to Judge Mahoney providing another status report on the inquiry. This letter again confirmed that the inquiry was completed, but the convening authority still had not completed his review and determined whether to release the report. Judge Mahoney did not see this letter until he arrived at Lakenheath Royal Air Force Base to conduct the post-trial session.

When the post-trial session convened, Judge Mahoney again stated his purpose was to determine whether there was a willful flouting of authority of the trial judge by Colonel Long re-ordering Tilghman into confinement after the judge released him. Judge Mahoney also restated the position he had expressed in his letter to the convening authority that he wanted to dispel any notions of improper or condoned commander interference with courts-martial within the Sixth Judiciary Circuit. In response to voir dire by trial counsel, Judge Mahoney, quoting from the Judge Advocate General's 13 April 1992 letter, emphasized that he was conducting the post-trial session because allegations of unlawful command influence must be considered "systemically and can't wait for resolution in appellate opinions months or years later." He also stated he was solely concerned with the apparent willful flouting of authority and its appearance as unlawful command influence and not with whether Tilghman had been adequately compensated for any illegal pretrial confinement.

Judge Mahoney also explained his reasons for detailing himself to conduct the post-trial session. First, he stated findings and sentencing were complete and the normal preference for continuity of the trial judge was no longer a relevant factor. Second, he was concerned with the appearance of conflict or bias involved if Judge McShane conducted the post-trial session. Third, Judge Mahoney felt it was his proper role as the Chief Judge of the Sixth Judiciary Circuit to conduct any judicial inquiry into the existence or appearance of unlawful command influence or the condoning of such influence involving a court-martial tried in his circuit.

When questioned as to his authority to conduct a post-trial session for his stated purposes, Judge Mahoney stated his authority came from both R.C.M. 1102 and his inherent authority as a military judge.

The government moved for continuances to allow additional preparation time, to interview Judge McShane, and to seek an extraordinary writ. Trial counsel also moved to abate the session as having no basis in law and to recuse Judge Mahoney from conducting the hearing. Judge Mahoney denied these motions. Thereafter, despite the fact the trial counsel admitted having in his possession a copy of the report of inquiry ordered by the convening authority, the government refused to provide Judge Mahoney or the defense a copy of it. Trial counsel also refused to answer any of Judge Mahoney's questions about the inquiry including: the date of the report, the name of the inquiry officer, the number of the witness statements attached, a list of the witnesses interviewed, the length of the report, and any factual summary or narrative provided by the inquiry officer. At a later point in the hearing, the trial counsel reported that he had been ordered to return his copy of the report of inquiry.

Despite the show cause nature of the hearing, the government introduced only one item of evidence, Colonel Long's Pretrial Confinement Memorandum dated 20 March 1992. Trial counsel refused to offer any other evidence and refused to make Colonel Long or any other participant in the decision to re-confine Tilghman available as a witness. Judge Mahoney asked Tilghman's defense counsel to provide him affidavits detailing their recollection of the events surrounding Tilghman's re-confinement.

On 7 May 1992, Judge Mahoney concluded the post-trial session and issued an interim ruling. In that ruling, he stated that he held the post-trial session to ascertain whether unlawful command interference or the appearance thereof occurred in Tilghman's case because of Colonel Long's re-confinement order. Noting that a judicial hearing became necessary when it became apparent that the government was not taking expeditious action to address this problem, he stated:

> The perception of unlawful command intervention in the trial process by a commander countermanding a judicial ruling, is one that seriously undermines the image of military justice, and the confidence of military members that they will be treated fairly and in accord with the law. The appearance of unlawful command interference in the judicial process cannot wait months or years for resolution. The diligence and speed with which the command has followed up on this matter has fallen well short of the mark.

Judge Mahoney found that, after notice that it was expected to present evidence concerning the circumstances of re-confining of Tilghman and any corrective action taken, the government had failed to cooperate and had presented "virtually no evidence going to the substantive issue before the court." He also found the government had failed to respond to the order to show cause why further relief should not be granted.

Despite the government's failure to meet its burden, Judge Mahoney decided not to enter a final ruling. He afforded the convening authority additional time to review the results of his inquiry and take appropriate corrective action. Judge Mahoney put the parties on notice that, if he heard nothing further from the parties, he would issue a final ruling at 9 a.m. on 20 May 1992.

On 11 May 1992, the government asked Judge Mahoney to reconsider his interim ruling. That motion was denied. Following the denial, the government asked this Court to enter a stay ordering Judge Mahoney to refrain from further action in Tilghman's case. After hearing oral argument, we denied the request for stay.

At 8:40 a.m. on 20 May 1992, the United States Air Forces Europe Deputy Staff Judge Advocate delivered to Judge Mahoney a copy of the undated report of the inquiry ordered by the convening authority into the re-confinement of Tilghman. Judge Mahoney delayed his final ruling to consider this report. Finding that the re-

port and affidavits supplied by Tilghman's defense counsel provided sufficient evidence upon which to base a decision, Judge Mahoney issued a final ruling on 22 May 1992. *See* Appendix 1. Before issuing his final ruling, Judge Mahoney denied two defense discovery requests which were at least partially satisfied by the release of the report of inquiry. He also denied a defense motion to disqualify the convening authority and his staff judge advocate from further participation in Tilghman's case and a motion to set aside Tilghman's findings and sentence.

In making his final ruling, Judge Mahoney found:

1. The government failed to present adequate evidence to Judge McShane to justify confining Tilghman the evening of 13 March 1992.

2. Colonel Long had alternatives available to him other than violating Judge McShane's order directing Tilghman's release from confinement. Colonel Long could have used a lesser form of restraint to control Tilghman's actions on the evening of 13 March. He could have also requested another hearing to present additional evidence to justify confining Tilghman.

3. Once Judge McShane ordered Tilghman's release from confinement, Tilghman could not legally be re-confined without discovery of new evidence or misconduct which, either alone or with all other available evidence, justified confinement.

4. No new evidence was discovered and no new misconduct occurred that justified Colonel Long's order re-confining Tilghman.

5. Both Colonel Long and Captain Essex (the acting staff judge advocate) knew that any re-confinement order, without new evidence, would be unlawful.

6. Colonel Long felt it was his prerogative as a commander to countermand the judicial order and re-confine Tilghman.

7. The government failed to meet its burden to establish:

a. That the United States did not willfully flout the law in re-confining Tilghman contrary to the trial court's judicial determination and order;

b. The Government had taken corrective action; and

c. Why further relief should not be granted.

Judge Mahoney concluded that he had observed "no previous example of such cavalier disregard for due process and the rule of law" in 16 years of experience as a military trial and appellate judge. He ordered:

Consistent with the foregoing, and for the express purpose of deterring commanders and judge advocates from committing or condoning similar breaches of law when displeased by judicial rulings, the court herewith directs further administrative credit to be applied to the accused's sentence to confinement (in addition to any other credit to which the accused may be entitled) in the amount of 18 months.

## II. LAW AND ANALYSIS.

### A. Authority and Standard for Extraordinary Relief.

The authority of this Court to grant the government extraordinary relief from a ruling or action of a military judge is well established. *See Dettinger v. United States*, 7 M.J. 216 (C.M.A.1979); *United States v. Mahoney*, 24 M.J. 911 (A.F.C.M.R.1987); *United States v. Bowlden*, 16 M.J. 878 (A.F.C.M.R.1983); Air Force Regulation 111–1, *Military Justice Guide*, paragraph 12–19 (9 March 1990).

██ The government asks us to issue a writ of prohibition against Judge Mahoney and to declare his post-trial session and rulings null and void. The ability of courts of military review to grant extraordinary relief through writs of mandamus and prohibition derives from military case law and the All Writs Act. *See Dettinger*, 7 M.J. at 220; *McPhail v. United States*, 1 M.J. 457, 462 (C.M.A.1976); *Pearson v. Bloss*, 28 M.J. 764, 766 (A.F.C.M.R.1989); 28 U.S.C. § 1651(a) (1988). If we have the powers

granted by the All Writs Act to restrict an inferior court to a lawful exercise of its prescribed jurisdiction, that power should carry with it the power to declare the acts of an inferior court null and void. Even if it does not carry with it such power, our authority derived from the All Writs Act includes the ability to issue a writ of mandamus ordering Judge Mahoney to withdraw both his interim and final rulings. *Dettinger,* 7 M.J. at 220. Therefore, we have the power to grant the relief the government requests.

When the government asks for a writ of prohibition or other extraordinary relief it must meet an extremely heavy burden. As we recently stated:

> [W]rits of mandamus are a drastic remedy that should be reserved for truly extraordinary cases requiring limitation of a lower court to the lawful exercise of prescribed jurisdiction. *Harrison v. United States,* 20 M.J. 55, 57 (C.M.A. 1985); *Porter v. Eggers,* 32 M.J. 583 (A.C.M.R.1990). This drastic remedy is not for cases where the error alleged is a mere abuse of discretion or even a gross error of the lower court. The petitioner must be seeking relief from a "judicial usurpation of power." *Will v. United States,* 389 U.S. 90, 88 S.Ct. 269, 19 L.Ed.2d 305 (1967); *Murray v. Haldeman,* 16 M.J. 74 (C.M.A.1983).

When we review a case submitted to us for extraordinary relief, we are not at liberty to substitute our judgment for that of the trial judge. *United States v. Bowlden,* 16 M.J. 878 (A.F.C.M.R.1983); *United States v. Pereira,* 13 M.J. 632 (A.F.C.M.R.1982); *Porter,* 32 M.J. at 584. Our task is to determine if the trial judge exceeded his authority and ruled contrary to statute, settled case law, or valid regulation. *United States v. Labella,* 15 M.J. 228, 229 (C.M.A.1983); *Bowlden,* 16 M.J. at 878; *Porter,* 32 M.J. at 584.

*Evans v. Kilroy,* 33 M.J. 730, 733 (A.F.C.M.R.1991).

In determining whether the government met its burden for the requested relief, we will look at each alleged "ultra vires" act taken by Judge Mahoney and determine whether that particular act amounted to a "judicial usurpation of power." We consider this method to be the only logical approach to the analysis of this case.[2] We will begin with Judge Mahoney's purpose for conducting the Tilghman post-trial session.[3]

## B. Authority for the Post–Trial Session.

█ Does a military judge have the authority to convene a post-trial session to inquire into possible improper command intervention? The government contends that R.C.M. 1102 does not permit a post-trial session for this purpose. We disagree and find the convening of Tilghman's post-trial session not a "judicial usurpation of power."

In determining a military judge's authority to inquire into a commander's disregard of a judicial order, it may be helpful to understand something about the evolution of the role of a military judge in the military justice system.

Our military jurisprudence traces its legitimacy to Article I, section 8, clause 14 of our Constitution, a social compact by which the people agreed, "The Congress shall have power ... to make rules for the government and regulation of the land and naval forces." In our two centuries of separate government, military criminal law has evolved into a criminal law system that looks and acts like that which governs our civilian neighbors while remaining portable and responsive to the special conditions governing a military member's life. The most emphatic step in that evolution came with enactment of the Uniform Code of

---

**2.** We note that the government took a similar approach in its brief to this Court. Any other approach invites illogical and emotional results.

**3.** The government does not complain that Judge Mahoney's acts prior to detailing himself to conduct the post-trial session, i.e., writing letters

to the convening authority and his staff judge advocate recommending an inquiry and communicating with the staff judge advocate by telephone concerning the status of the inquiry, amounted to "ultra vires" acts.

Military Justice (UCMJ) in 1950.[4] Four decades ago it first imposed a requirement that our procedural and evidentiary rules conform as much as possible to those prevailing in the United States district courts. Article 36(a), UCMJ.

After 16 years under the UCMJ, another major evolutionary step occurred when Congress gave us the military judge in 1968.[5] One of the major themes in the development of our criminal jurisprudence since 1968 has been the gradual definition of what it means to be a military judge.

Among other important characteristics, American judges stand between the power of the Executive and the rights of the citizen, permitting the enjoyment of individual's rights to be diminished only so much as the law permits exercise of the Executive's power. Using military justice terms, the military judge stands between the vast authority of command and the relatively concise list of rights enjoyed by military members accused of crime. In this case, Judge McShane stood between Colonel Long's authority to imprison Sergeant Tilghman and Tilghman's right to be free if, upon judicial review, inadequate grounds were found for imprisonment.

Faced with what appeared to be a blatant disregard of a judicial order, can a military judge convene a post-trial session to inquire into the facts of that disregard and fashion a remedy? We find that convening such a post-trial session does not amount to a "judicial usurpation of power."

R.C.M. 1102(b)(2) provides a general statement for the purpose of a post-trial Article 39(a), UCMJ, session:

An Article 39(a) session under this rule may be called for the purpose of inquiring into, and, when appropriate, resolving any matter which arises after trial and which substantially affects the legal sufficiency of any findings of guilty or the sentence.

In addition to R.C.M. 1102, the military judge relied upon his inherent authority to justify conducting the post-trial session.

Whether construing R.C.M. 1102 or inherent authority, the courts have broadly interpreted a military judge's authority to conduct post-trial Article 39(a) sessions.

In *United States v. Griffith*, 27 M.J. 42, 47 (C.M.A.1988), the Court of Military Appeals held that broad powers to hold post-trial sessions were consistent with congressional intent "in the establishment of the position and title of 'military judge' by the Military Justice Act of 1968." The *Griffith* court, holding that a military judge could grant a motion for a finding of not guilty in a post-trial session, stated:

[I]f, before authenticating the record of trial, a military judge becomes aware of an error which has prejudiced the rights of the accused ... he may take remedial action on behalf of the accused without awaiting an order therefor by an appellate court.

If command interference is involved, a military judge's warrant for a post-trial session may become even broader. In *United States v. Scaff*, 29 M.J. 60 (C.M.A. 1989), the Court of Military Appeals addressed the impact of command interference upon a military judge's powers to hold post-trial sessions. In that case, the convening authority refused to fund travel for a witness the military judge determined necessary to testify at a post-trial session. Finding the convening authority improperly negated a ruling of the military judge, the Court said:

[W]e have interpreted Article 39(a) of the Uniform Code to authorize the military judge to take such action after trial and before authenticating the record as may be required in the interest of justice.

\* \* \* \* \* \*

[W]e are convinced that a military judge is not helpless under such circumstances and that a convening authority may not flout the judge's authority with impunity.

29 M.J. at 65, 66; *see also United States v. Witherspoon*, 16 M.J. 252 (C.M.A.1983) (approved post-trial Article 39(a) session to consider possible court member miscon-

---

4. Pub.L. No. 506, 64 Stat. 108 (1950).

5. Pub.L. No. 90–632, § 2(9), 82 Stat. 1335, 1336 (1968).

duct); *United States v. Brickey,* 16 M.J. 258 (C.M.A.1983) (valid post-trial Article 39(a) session to determine if trial counsel violated duty to disclose exculpatory evidence).

The government also contends that R.C.M. 1102 limits the authority of a military judge to conduct post-trial sessions to those cases where some matter "arises after trial." Such interpretation would not necessarily invalidate the post-trial session conducted by Judge Mahoney. Judge Mahoney called Tilghman's post-trial session to address the appearance of unlawful command interference in Tilghman's court-martial. During the Article 39(a) session at the end of the trial, Colonel McShane did not pursue the details of Colonel Long's decision to re-confine Tilghman. The full extent of the command interference and disregard of Judge McShane's order only came to light when Colonel Long prepared his memorandum in support of the re-confinement some 4 days after trial. Additionally, Judge Mahoney did not determine a post-trial session to be necessary until a lack of expeditious action in investigating and correcting Colonel Long's command interference became evident.

Therefore, with the broad authority granted a military judge to conduct post-trial sessions and the circumstances of the military judge's decision to proceed with this post-trial session, we do not find the convening of that session to amount to a "judicial usurpation of power." We note that no one has defended Colonel Long's choice to confine Sergeant Tilghman the second time.[6] A military judge has authority to do what Judge Mahoney did, without interference, until stopped by an appellate order.

C. Detailing Judge Mahoney to Tilghman's Court–Martial.

■ The government contends that Judge Mahoney improperly substituted himself for Judge McShane as the military

judge for Tilghman's court-martial. They argue he did not have "good cause" under R.C.M. 505(e) to substitute himself and no permissible reason for the substitution appears in the record. We disagree with the government's analysis. We find that Judge Mahoney had the authority to detail himself and that doing so did not constitute a "judicial usurpation of power."

■ The authority to detail trial judges for courts-martial conducted in the Air Force belongs to the Chief Trial Judge of the Air Force. Article 26(a), UCMJ; R.C.M. 503(b)(1); Air Force Regulation 111–1, *Military Justice Guide,* paragraph 8–2b (March 1990). The Chief Trial Judge of the Air Force delegated this authority to all Air Force military judges with the proviso that normally the chief circuit military judge will detail military judges for cases tried in his or her circuit. Letter 20 May 1991, Subject: Detailing Military Judges to Courts–Martial, from Chief Trial Judge, USAF Trial Judiciary, to all military judges (Appendix 2). Therefore, Judge Mahoney or any other military judge assigned to the Sixth Judiciary Circuit could lawfully detail himself to any court-martial tried in that circuit.

However, finding Judge Mahoney had the authority to detail himself does not end our inquiry into whether he properly detailed himself to Tilghman's case. Judge McShane had already been detailed military judge for Tilghman's trial, conducted the trial, and adjourned it. Any other judge detailing himself or herself to the Tilghman court-martial would be a substitution in place of Judge McShane.

R.C.M. 1102(e)(1)(B), provides that for a post-trial session "a different military judge may be detailed, subject to R.C.M. 502(c)[7] and 902, for good cause."

R.C.M. 902 governs when a military judge shall disqualify himself to preside over a court-martial. R.C.M. 902(b)(1) and

---

6. *See United States v. Malia,* 6 M.J. 65 (C.M.A. 1979).

7. R.C.M. 502(c) specifies the qualifications to serve as a military judge. The government does

not contend that Judge Mahoney lacked the qualifications to serve as a military judge, and we do not address this aspect further.

(3) state the following specific grounds for disqualification:

> Where the military judge has a personal bias or prejudice concerning a party or *personal knowledge of disputed evidentiary facts concerning the proceeding.* Where the military judge has been or *will be a witness in the same case....* (Emphasis added).

Judge Mahoney's stated reasons for substituting himself as the military judge to conduct Tilghman's post-trial session included a "potential conflict or bias" involved if Judge McShane conducted the post-trial session.

Since we are concerned with the correctness of the detail of a military judge to a post-trial Article 39(a) session, we find the government's reliance on R.C.M. 505(e) misplaced. R.C.M. 1102, read with R.C.M. 902(b), governs any decision to substitute another military judge in place of Judge McShane for a post-trial session. Analyzing these provisions, Air Force procedures for detailing military judges, and the circumstances of this case, we come to several conclusions. First, any military judge in the Sixth Judicial Circuit had the authority to detail himself to conduct Tilghman's post-trial session. Second, any military judge deciding to conduct such a post-trial session would not want Judge McShane to conduct the session if Judge McShane could be expected to disqualify himself because of personal knowledge of disputed facts or a likelihood he would become a witness. R.C.M. 902(b)(1), (3). Third, in conducting this post-trial session, it was very likely that Judge McShane, who presided over the trial, decided to release Tilghman from confinement, and provided administrative credit for Colonel Long's illegal order re-confining Tilghman, would become a witness at the post-trial session. In fact, when the session convened, the government requested a continuance to interview Judge McShane concerning his knowledge of possibly contested facts. Therefore, under the extraordinary circumstances of this case, Judge Mahoney's decision to conduct the post-trial session in place of Judge McShane because of "poten-tial *conflict* or bias" did not amount to a "judicial usurpation of power."

### D. Judge Mahoney's Refusal to Recuse Himself.

■ The government argues that Judge Mahoney was disqualified from conducting the post-trial session. Relying on the same R.C.M. 902(b)(1) they claimed inapplicable to Judge McShane, they argue Judge Mahoney had a "personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding." Placing this government contention in the correct context, we must decide whether Judge Mahoney's denial of the government's motion to recuse himself amounted to a judicial usurpation of power. We find it did not.

■ R.C.M. 902 provides guidance for a military judge to use in determining whether to disqualify himself. It does not provide the government or the accused any right to remove a military judge. The military judge involved in a case must search his conscience and determine whether his or her "impartiality might reasonably be questioned" or whether he or she "has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding." R.C.M. 902(a), (b)(1). In response to the government's motion, Judge Mahoney decided that he was not disqualified from conducting Tilghman's post-trial session.

The government points out selected excerpts from Judge Mahoney's correspondence as evidence of his bias and prejudice. However, we find no indication of bias or prejudice on the part of Judge Mahoney during the session. Further, it is readily apparent that Judge Mahoney knew very little of the facts of the circumstances of Tilghman's confinement and tried to conduct a unbiased factfinding inquiry into the matter. In fact, the record of the post-trial session shows numerous examples of considerable restraint by Judge Mahoney in the face of a completely uncooperative stance on the part of the government. Such restraint and a serious desire to determine the facts are inconsistent with any

view that Judge Mahoney was biased or prejudiced or had prejudged the question of command interference. We do not find Judge Mahoney's decision not to recuse himself to be so contrary to the evidence of record to amount to a "judicial usurpation of power."

### E. *Mabe* Influence?

█ The government claims Judge Mahoney engaged in improper command influence by substituting himself in the place of Judge McShane and conducting the post-trial session. It relies upon *United States v. Mabe*, 33 M.J. 200 (C.M.A.1991).

In *Mabe*, the Chief Judge, Navy–Marine Corps Trial Judiciary, sent a note to one of his circuit judges expressing concerns about lenient sentencing in that circuit. Both the Navy–Marine Corps Court of Military Review and the Court of Military Appeals found that the Navy–Marine Corps Chief Judge exercised unlawful command influence. *Mabe*, 33 M.J. at 203; *United States v. Mabe*, 30 M.J. 1254, 1266 (N.M.C.M.R.1990).

As the Chief Circuit Judge for the Sixth Judiciary Circuit, Judge Mahoney was the nominal supervisor of Judge McShane. However, we find no indications that he exercised improper command influence in this case. During the government's voir dire to determine grounds for possible disqualification, trial counsel questioned Judge Mahoney about his contacts with Judge McShane. None of Judge Mahoney's responses to those questions contained any sign of dissatisfaction with Judge McShane's handling of Tilghman's case or the remedy Judge McShane had given for the illegal confinement.

Judge Mahoney admitted asking Judge McShane not to authenticate Tilghman's record until there was opportunity to determine if corrective actions were taken with respect to the apparent command intervention. Judge Mahoney explained that this was because a military judge's authority to conduct a post-trial session only continued until authentication. Further, Mahoney's request had no real impact because Tilghman's record was not ready for authentication until after Mahoney's post-trial session.[8]

In *Mabe* the chief judge's note provided direct evidence of criticism amounting to unlawful command influence. The government presents us no evidence that Judge Mahoney ever directed criticism, oral or written, at Judge McShane for his handling of the Tilghman case. To the contrary, Judge Mahoney's final order stated:

> This post-trial judicial inquiry is not concerned with the adequacy of the compensation granted the accused for illegal confinement imposed upon him. Judge McShane granted relief of 10 days credit, which he concluded was appropriate relief for the wrong suffered by the accused. That was his decision to make, based upon the evidence available to him, and his exercise of discretion is not subject to review by another trial judge.

Further, Judge Mahoney stated repeatedly that he was not in disagreement with Judge McShane's actions and remedy. Judge Mahoney made it clear that his concerns dealt with the impact upon the integrity of military justice in the Air Force Sixth Judicial Circuit due to improper command intervention by Colonel Long and the apparent lack of any action to investigate and address this matter.

The Navy–Marine Corps Court of Military Review stated in *Mabe*:

> [I]t is entirely appropriate for a Chief Judge, or any other supervising judge, to be concerned with upholding the judiciary's integrity and insuring its reputation for impartiality. Such a responsibility, however, must be exercised with caution so that the independence of an individual judge or the judiciary as a whole is not jeopardized.

30 M.J. at 1266. Judge Mahoney's attempts to uphold the integrity of the Air Force military justice system and the Air

---

**8.** The court reporter's chronology included with Tilghman's record shows the court reporter did not finish the record until 13 May 1992. Judge McShane authenticated the record on 19 May 1992.

Force judiciary did not violate the dictates of *Mabe.*

### F. An Ultra Vires Remedy?

■ Finally, the government describes the remedy imposed in the military judge's final order as unauthorized retribution for Colonel Long's decision. We do not agree.

The government finds no basis for the remedy in R.C.M. 305 and points to the military judge's stated purpose of deterrence as another sign of the "ultra vires" nature of the remedy. We agree that R.C.M. 305 does not specifically provide for the type of remedy fashioned by the military judge. However, we also agree with the government's conclusion that Judge Mahoney did not intend to rely upon R.C.M. 305. As we stated above, he clearly stated he did not question the adequacy of Judge McShane's R.C.M. 305(k) remedy. He specifically sought to address and provide a remedy for the unlawful command intervention. To focus on R.C.M. 305's remedies for illegal pretrial confinement misses the point of the post-trial session.

We do not find the military judge's conclusion that illegal command intervention occurred in this case to be completely without legal basis. R.C.M. 104(a)(1) provides:

> *Convening authorities and commanders.* No convening authority or commander may censure, reprimand, or admonish a court-martial ... military judge ... with respect to the findings or sentence adjudged by the court-martial or tribunal, or *with respect to any other exercise of the functions of the court-martial or tribunal or such persons in the conduct of the proceedings.* (Emphasis added).

It is not unreasonable that Judge Mahoney correctly perceived that the military community would view Colonel Long's deliberate disobedience of and apparent contempt for the judicial release order as the functional equivalent of a censure or admonishment. The government's refusal to cooperate with the post-trial session and offer any evidence to counter the perception of unlawful command intervention did nothing to dispel this perception. Further, when the government finally made its own inquiry into the matter available, it showed a deliberate command decision to disregard the judicial order releasing Tilghman from confinement.[9]

Having been applauded for using unconventional remedial efforts in an earlier case involving unlawful command influence, Judge Mahoney was no novice with respect to possible ramifications of improper court-martial command intervention. *See United States v. Sullivan,* 26 M.J. 442 (C.M.A. 1988). He was also aware of the limited means at his disposal to deal with unlawful command influence without the cooperation of the command. In *Sullivan,* command cooperation permitted him and Judge Weir to eliminate taint of command influence arising from command criticism of noncommissioned officers making statements for or testifying on behalf of drug offenders. In reviewing the results of their corrective actions, Judge Cox re-emphasized that "Command influence ... is the mortal enemy of military justice" and wrote:

> Fortunately, Judges Weir and Mahoney were alert to the necessity of intervening to insure fairness to the accused. We applaud their efforts, which protected not only the interests of the service mem-

9. Until 1984, Article 62(a), UCMJ, provided that a convening authority could require a military judge to "reconsider" a ruling. That article had an unhappy history limited first by judicial interpretation that "reconsider" only meant "reconsider" and did not mean "reverse," *United States v. Ware,* 1 M.J. 282, 285 (C.M.A.1976), and finally ended when the legislature eliminated it in the Military Justice Act of 1983. Pub.L. No. 98–209, § 5(c), 97 Stat. 1393, 1398 (1983). After that act, it became clear the final word on any matter at trial would be spoken by the military judge. If command did not agree with a military judge's ruling, the only resort available was appeal or request for an extraordinary writ. Article 62(a), UCMJ; *Dettinger v. United States,* 7 M.J. 216 (C.M.A.1979). Although further development of the military judge's role continued, *Ware* eliminated any serious theory that a commander could simply ignore a military judge's decision.

bers before them, but also the integrity of the military justice system.

*Sullivan,* 26 M.J. at 444.

In this case, the lack of command cooperation severely restricted Judge Mahoney's ability to fashion a remedy to deal with what he believed to be a serious instance of willful and unlawful command intervention in Tilghman's court-martial. To use his own words, he sought a "measured response" that would "clearly deter other commanders and their legal advisors from using selfhelp to overrule judicial orders with which they may disagree." Before deciding upon his remedy, Judge Mahoney considered and eliminated other options, including contempt and dismissal of all charges.[10]

The government claims Judge Mahoney engaged in an unauthorized and "ultra vires" remedy by ordering a punitive credit against Tilghman's sentence for deterrence purposes. As Judge Mahoney correctly noted, criminal justice includes a number of examples of judicial remedies designed to deter unacceptable conduct by police officials and commanders. More directly to the point, Judge Everett in *Scaff* stated:

> [A] convening authority may not flout the judge's authority with impunity.... [T]he military judge may issue an order for the Government to show cause why

the military judge should not set aside the findings and sentence.

29 M.J. at 66–67. Faced with evidence of unlawful command intervention in Tilghman's court-martial, Judge Mahoney issued a show cause order. The government refused to respond and then belatedly responded with inadequate evidence. The holding of *Scaff* would have permitted Judge Mahoney to have set aside Tilghman's findings and sentence. However, taking a "measured response," Judge Mahoney chose the less extreme remedy of reducing Tilghman's sentence by 18 months. Under the circumstances of this case, we do not find the military judge's remedy for unlawful command intervention a "judicial usurpation of power."

## III. CONCLUSION.

Our tone to this point might be misread as endorsing Judge Mahoney's intervention, but we refrain from that. We have held as a matter of law that none of Judge Mahoney's acts, each taken separately, constituted "a judicial usurpation of power." He was a military judge with authority to detail himself to a court-martial and to order a post-trial session. It would be unnecessary and unwise to further characterize his choices. However, it is important to

---

10. What both military judges needed in this case was the real power to punish contempt. There is no other label that so well describes what happened to Sergeant Tilghman and to both judges. Colonel Long confined Sergeant Tilghman with full knowledge that the military judge had ordered release. That virtually defines contempt. During the later sessions, the United States refused to produce the investigative report. It never asserted any privilege found in the Military Rules of Evidence, but instead, echoed ideas from administrative law, that the investigation had not been examined and therefore remained pre-decisional. Those ideas are so without substance in a criminal proceeding that to assert them bordered on disrespect. Complete contempt power would have been a better answer to these problems.

What was needed in this case was the existence of coercive judicial power when Colonel Long was considering his decision. It is unlikely that Colonel Long would have done as he did if he had been aware that he might be brought to the bar for such behavior. It is alien to a military member to behave in a way contemptuous of the orders of a higher authority. It is more likely that Colonel Long believed that he was doing good. Had he been informed by the legislature that disobedience of the order of a military judge constituted contempt, his choice would have been almost unimaginable. But he did not know, because it is not so. A military judge's contempt power remains oddly restrained and inconsistent with the other evolutionary advances. Had the contempt power been complete, there would have been no need for windfall, deterrent relief for Sergeant Tilghman. More modest compensatory relief would have been adequate. Had the contempt power been complete, Judge McShane would have had the direct and immediate coercive power that he really needed. Had the contempt power been complete, the supervisory interest that led Judge Mahoney to intervene would have been satisfied directly and publicly by Judge McShane in the first instance. Had it been complete, this episode might never have occurred.

understand fully the holding in this case to recognize the limits of this opinion.

This was not a ruling that terminated the prosecution, and so an appeal under Article 62 and R.C.M. 908 was unavailable to the United States. We have never explored the reviewability of a prophylactic and deterrent remedy under Article 66(c), but instinct suggests that we could not diminish the benefit of Judge Mahoney's remedy to Sergeant Tilghman. Thus, the only avenue of review remained a petition for extraordinary relief, invoking the "usurpation" standard.

That is the standard that we have applied in this case. To have found Judge Mahoney's decisions violated that standard, it would have been necessary for the United States to show us, on the record available for our appellate review, that his decisions exceeded the role of a judge in our government. Despite its honorable efforts in that regard, the United States was unable to do so. It was not sufficient to question the need to detail a new judge, to show that the purpose for the session was unrelated to Sergeant Tilghman, or to contest whether Colonel Long's decision constituted command influence. Though Judge Mahoney's persistent interest in publication of the investigative report and remedial action by the command could be taken to imply the zeal of a roving inspector general, it is clear enough that he sought to fill the role of judge. After cases like *Scaff*,[11] it is very hard to maintain that a military judge having authority to detail himself to a court-martial may not do so and order a post-trial session to examine what appears to the military judge to be command influence.

The government's request for extraordinary relief is

DENIED.

Senior Judge MCLAUTHLIN and Judge JAMES concur.

---

11. *Bouler v. Wood*, 1 M.J. 191 (C.M.A.1975), is a much earlier example in which a military judge was commended for having convened a session of a court-martial to which the case had not yet been referred, to inquire into pretrial confinement. *See also Fletcher v. Commanding Officer*, 2 M.J. 234 (C.M.A.1977).

## APPENDIX 1

### Appellate Exhibit LIX

Headquarters Air Force Legal Services Agency

In the Sixth USAF Judicial Circuit

Rhein–Main Air Base, Germany

UNITED STATES

v.

SSgt MICHAEL A. TILGHMAN

920th Field Training Det

RAF Bentwaters, UK

Post Trial Article 39a Session

Ruling on Motions

and

Final Order on Willful

Unlawful Command Interference

22 May 1992

FACTUAL BACKGROUND. The trial of the general court-martial in this case, convened by the commander, Third Air Force, was held 11 to 14 March 1992 at RAF Bentwaters. The evidence establishes that after the accused was convicted of several offenses late on 13 March 1992, Colonel George E. Long, the support group commander, ordered him into confinement. In a court hearing, where both sides were afforded the opportunity to be heard, Judge McShane ruled that there was no adequate showing of need to continue the accused's pretrial confinement, and he ordered the accused released. Despite that judicial ruling, Colonel Long again ordered the accused into confinement, and he was sought out by military and civilian police, arrested at his off-base home, taken to a civilian police station, and ultimately confined in a military confinement facility. After sentence was announced by the court members on 14 March 1992 the trial judge granted the accused 10 days compensatory

credit for the one day of unlawful confinement imposed by Colonel Long.

PROCEDURAL MATTERS. Hearings were held on 6–7 May 1992 to afford the government the opportunity to establish:

(a) that the United States did *not* willfully flout the law in re-confining the accused on 13 March 1992, contrary to the trial court's judicial determination and order;

(b) what corrective action, if any, has been taken as a result of this incident; and

(c) why further relief, prophylactic or compensatory, should not be granted.

Prior to that hearing, the government asked for a delay until 20 May 1992 for witness interview and preparation (App Ex XXXII). That delay request was denied, but after the procedural challenges were denied by this court, the Interim Order, dated 7 May 1992 (App Ex XLVII), did grant the government the requested time to present further matters. The Interim order also announced that the government had thus far failed to meet its burden with respect to any of the above factors.

A motion for reconsideration of the original ruling—joined in by the Chief, Government Trial and Appellate Counsel Division—was submitted (App Ex XLVIII) and denied on 11 May 1992 (App Ex XLIX). A request for a stay order was filed with the Air Force Court of Military Review on 13 May 1992 (App Ex L). A reply was filed (App Ex LI), and the requested stay was denied by that court on 15 May 1992.

LETTER FROM CONVENING AUTHORITY. On 19 May 1992 the undersigned received a FAX transmission of a letter from the convening authority dated 16 May 1992 (App Ex LII). The convening authority advised this court that he has carefully reviewed the contents of the report of inquiry submitted to him in this matter, and discussed the matter with his staff judge advocate. He advised the court that he found no evidence that Colonel Long ignored or flouted the law. He also found it clear from the inquiry that Colonel Long was never advised by the 81 TFW/JA of the legal constraints on pretrial confinement after a judicial ruling. The convening authority concluded that Colonel Long acted in good faith while discharging his "command responsibility for discipline and public safety in reaching his decision." Finally, the convening authority has advised the court that he considers it "inappropriate to forward directly to [the court] the contents of a command-directed investigation conducted at [his] direction and for the illumination of [his] command judgement on the issue." The convening authority's letter states that it "is explicitly not a reply to the issues which I understand to have been raised at the post-trial hearing you conducted in this case." Upon receipt of the letter, the court telephonically notified counsel for both sides that it had been received, and that it was, as indicated by its own terms, non-responsive to the issue before the court.

THE REPORT OF INQUIRY. This court indicated at the very outset that a command directed inquiry would be the most expeditious way to uncover the facts in this unfortunate matter. Both public and judicial scrutiny of the facts would be necessary to avoid the appearance of condoning of unlawful command interference in the judicial process. At the hearing held 6 May 1992, the circuit trial counsel had a copy of the report of inquiry but declined to turn it over to the circuit defense counsel, notwithstanding valid discovery request. At a later point in the proceedings, the Circuit Trial Counsel reported that the Report had been taken away from him, and that the government would not comply with the discovery request, notwithstanding the court's determination that the report was discoverable. The court denied circuit defense counsel's request to order production of the report because the court declines to issue orders which are incapable of effective judicial enforcement. The court did, however, request that the circuit trial counsel describe the report by date, author, length, and number of witnesses interviewed so that the precise subject matter of the discovery request could be determined with some certainty in the course of appellate review. Trial Counsel requested a recess to consult with the convening au-

thority's staff judge advocate, and later reported that he had been directed *not* to comply with the court's request for a description of the report of inquiry.

RELEASE OF REPORT. At 0840 hours on 20 May 1992, 20 minutes before the court was prepared to issue its final order in this matter, a copy of an undated report of inquiry conducted by Colonel William C. Miller was delivered by messenger from the USAFE Deputy Staff Judge Advocate to the undersigned, at Rhein–Main Air Base, Germany (App Ex LIII). Circuit defense counsel was advised of this fact by telephone, and requested a copy from the staff judge advocate of 3rd Air Force, but was denied. Consequently, a copy was sent by FAX by the undersigned to the circuit defense counsel on the afternoon of 20 May 1992.

DISPOSITION OF MOTIONS.

(1) By motion dated 19 May 1992 (App Ex LIV), circuit defense counsel requested an order by this court compelling discovery of the original discovery request and one submitted to the government after the conclusion of the hearing on 6–7 May 1992. Alternatively, the defense requested *in camera* review of the discovery material by the court. With regard to the latter, even if the government were amenable to the court conducting *in camera* review, the court would not be inclined to do so, absent some showing of necessity. Plainly stated, the court is aware of no basis to conclude that less than all the facts in this matter should be subject to scrutiny by the defense and the public. Discovery of the primary object of the motion, the report of inquiry conducted by Colonel Miller, was accomplished, albeit indirectly. The motion is DENIED.

(2) By motion dated 20 May 1992 (App Ex LV), the defense reasserts its discovery requests of 5 May 92 (App Ex XXXIV) and 8 May 1992 (App Ex LVI) which remain unacknowledged and unsatisfied. The defense further requests information regarding the personal involvement of the Chief, Government Trial and Appellate Counsel Division in these proceedings. The govern-

ment, having originally failed to meet its burden in this matter, has at least provided to the court a copy of the report of inquiry conducted at the direction of 3 AF/CC. This evidence, coupled with the affidavits of defense counsel, provides sufficient evidence upon which to base its decision. While further pursuit of the facts may be appropriate for other purposes in other forums, it is beyond the scope of this proceeding. The motion is DENIED.

(3) By motion dated 20 May 1992 (App Ex LVII), the defense asks that the court disqualify the convening authority and his staff judge advocate from further participation in the case, for a variety of reasons. While there might be a circumstance where it would be appropriate for a trial judge to entertain and rule on such a motion, this isn't one of them. The matter is beyond the scope of the proceedings at hand. The motion is DISMISSED.

(4) By motion dated 21 May 1992 (App Ex LVIII), the defense moves for appropriate relief in the form of setting aside the findings and sentence. In the alternative, the motion requests the court to compel compliance with all prior discovery requests, and convene another Article 39a Session to receive further evidence. For reasons previously stated, and because the court regards the evidence as adequately developed for purposes of this hearing, this motion is DENIED.

ISSUES NOT BEFORE THE COURT.

(1) This post-trial judicial inquiry is *not* directed toward evaluating the appropriateness of Colonel Long's initial decision to confine the accused following conviction. The court recognizes that mid-trial confinement may in some circumstances be required. However, it would appear that where the only new circumstance was the fact of a conviction, that fact alone, or added to pre-existing facts would be unlikely to warrant imposition or reimposition of pretrial confinement. Some other fact, such as an outburst, a threat, or a breach of restriction would appear more significant in warranting imposition of confinement to assure the accused's presence or protect society.

(2) This post-trial judicial inquiry is *not* directed toward the correctness of the judge's ruling ordering the accused released from confinement. In a detailed memo prepared for 3 AF/JA one week after-the-fact, Colonel Long sets out the factors he considered in imposing pretrial restraint. He was correct in maintaining that the trial judge did not consider all of those factors. The government was afforded the opportunity to present those matters at the hearing conducted by Judge McShane, but did not make a complete presentation. On the other hand, Judge McShane considered matters not available to Colonel Long, including the judge's observations of the accused throughout the trial and his courtroom inquiry of the accused.

(3) This post-trial judicial inquiry is *not* concerned with the adequacy of the compensation granted the accused for the illegal confinement imposed upon him. Judge McShane granted relief of 10 days' credit, which he concluded was appropriate relief for the wrong suffered by the accused. That was his decision to make, based upon the evidence available to him, and his exercise of discretion is not subject to review by another trial judge.

(4) This post-trial judicial inquiry is *not* concerned with whether the members' sentence might have been lessened if they had been permitted to learn of the mid-trial confinement. At the 6 May 1992 hearing the circuit defense counsel maintained that, had the court members been aware of the circumstances surrounding the unlawful re-imposition of pretrial confinement, and the manner in which the accused was taken from his home at night and denied access to counsel, they might have adjudged a lesser sentence. Judge McShane advanced a fear that such evidence might prejudice the accused, and the defense counsel acquiesced in his decision (App Ex XXXVI, pp 14–15). Whether failure to so inform the members amounted to error is a matter for appellate review, clearly beyond the limited scope of this proceeding.

ISSUE PRESENTED. The narrow issue before this court is whether Colonel Long knew it was unlawful to re-initiate pretrial confinement after the accused had been released by Judge McShane.

THE COMMANDER'S POSITION. According to Captain Essex, the acting staff judge advocate, Colonel Long, "was clearly convinced that as a commander he had the authority to place individuals in confinement, and [he] felt the judge had exceeded his authority."

In his statement to the inquiry officer, Colonel Long stated that "It was obvious to me that the judge's decision [releasing the accused from pretrial confinement] was wrong." He went on to say that Captain Essex agreed with him, and added that "the military judge was not made aware of the information that I had regarding SSgt Tilghman.... I believe that I had a better grasp of this case than what was presented to the military judge. I question the authority of a military judge to countermand my confinement order."

Captain Essex advised the commander that the manual [for courts-martial] allowed for judicial review of orders, and if his reconfinement of the accused were found to be illegal, the accused could get credit for the time in jail. Colonel Long stated he believed that the accused's case "met at least two of the three criteria for authorizing pretrial confinement." He indicated he made his decision "realizing the issue of commanders authority versus judge's ruling could be resolved later."

According to Capt Essex, Colonel Long stated he "believed the judge was without authority to summarily overrule the decision without taking evidence." Of course, Capt Essex was actually present at the Article 39a session in question, and was necessarily aware that both sides were provided the opportunity to produce evidence. The failure, if there was any, was not the judge's in failing to *take* evidence, but the government's in failing to *offer* evidence to justify pretrial confinement.

ALTERNATIVES AVAILABLE TO THE COMMANDER. The commander was not without clear, practical, effective and legal

alternatives to violation of Judge McShane's order. As a prerequisite to the decision to confine, lesser modes of restraint must be considered. Imposition of lesser modes of restraint were not precluded by Judge McShane's order. Even if the commander felt that only pretrial confinement would do, another hearing—and another opportunity to present evidence— could have been sought. Neither of these lawful alternatives was pursued.

THE LAW. At a hearing on the evening of 13 March 1992, with opportunity to present evidence, Judge McShane determined that information presented to him did not establish sufficient grounds for continued confinement. R.C.M. 305(j)(1)(C); R.C.M. 305(h)(2)(B). Accordingly he ordered the accused be released (not placed in) pretrial confinement. Under R.C.M. 305(l), "no person whose release from pretrial confinement has been directed by [the trial judge] may be confined again before completion of trial except upon the discovery, after the order of release, of evidence or of misconduct which, either alone or in conjunction with all other available evidence justifies confinement. In this case it is abundantly clear that there was no new evidence nor misconduct between Judge McShane's order releasing the accused, and his reconfinement at the direction of Colonel Long. Accordingly, Judge McShane found the confinement re-imposed by Colonel Long to be unlawful under R.C.M. 305(l), and granted administrative credit under R.C.M. 305(k).

FINDINGS. The government has failed to meet its burden to establish:

(a) that the United States did not willfully flout the law in re-confining the accused on 13 March 1992, contrary to the trial court's judicial determination and order;

(b) the government has not shown that any corrective action has been taken as a result of this incident; and

(c) the government has not shown why further relief, prophylactic or compensatory, should not be granted.

Moreover, it is clear from the evidence, including statements made to the inquiry officer, that both Colonel Long and Captain Essex realized that any re-confinement order issued by Colonel Long without new evidence would be unlawful. Colonel Long may well have been under the impression— based upon his discussion with the acting staff judge advocate—that the consequences for re-imposing confinement in violation of the judge's order would be slight, but clearly he knew—and his judge advocate knew—that it was unlawful to do so. Nonetheless, Colonel Long felt it was his prerogative as commander to do so, and he did.

CONCLUSION. "Command influence is the mortal enemy of military justice." *United States v. Sullivan*, 26 M.J. 442, 444 (CMA 1988). Command interference in a trial by court-martial is worse—it's an act of betrayal by one charged with insuring the integrity of the judicial process. In the undersigned's 16 years as a trial and appellate judge, no previous example of such cavalier disregard for due process and the rule of law comes to mind. As was once observed by the Court of Military Review, there exists a generally well-founded trust and mutual respect amongst the participants in the military justice system: "We have an abiding faith in the military justice system and in the integrity of those individuals charged with making it work." *United States v. Fortney*, 12 M.J. 987, 990 (AFCMR 1982).

A basic precept of the UCMJ, and of our common law heritage is that no man is above the law. In the military that is equally true, regardless of position or rank, from the commander-in-chief down to the newest recruit. Each is subject to the rule of law. In judicial matters it is well recognized that the courts do and must have the final say. Within the military justice system it has been heretofore clearly understood that convening authorities, trial judges, and counsel—in those roles and irrespective of grade—must give due deference to each other in the performance of their functions. A commander's authority and grade carry no special privilege in the military judicial process.

FASHIONING A REMEDY. In view of the lack of precedent for judicial sanctions

for willful and unlawful interference in the judicial process, the court is not constrained to apply a particular form or degree of action. Under the *Burton* speedy trial rule, for example, the only form of authorized sanction was dismissal of the affected charges and specifications. For unlawful searches, the only form of action—prior to the advent of the "good faith" exception—was exclusion of the tainted evidence. The court believes that the ultimate sanction of dismissal of all charges and specifications is available, if appropriate, to deter flouting of the judicial process, but such an extreme remedy should not be required in all cases. Since this is a case of first impression, a measured response is appropriate. Yet it must be one which will clearly deter other commanders and their legal advisors from using selfhelp to overrule judicial orders with which they may disagree. An unfortunate adjunct of deterrent remedies in criminal cases is that—for that a particular case—the solution itself creates an appearance of injustice. The hope is that this lesser evil will discourage the greater evils and promote compliance with the law by its deterrent impact.

ORDER. Consistent with the foregoing, and for the express purpose of deterring commanders and judge advocates from committing or condoning similar breaches of law when displeased by judicial rulings, the court herewith directs further administrative credit to be applied to the accused's sentence to confinement (in addition to any other credit to which the accused may be entitled) in the amount of 18 months.

/s/ J. Jeremiah Mahoney

J. JEREMIAH MAHONEY, Colonel, USAF

Chief Circuit Military Judge

APPENDIX 2

DEPARTMENT OF THE AIR FORCE

HEADQUARTERS UNITED STATES AIR FORCE

WASHINGTON, D.C.

May 20 1991

REPLY TO

ATTN OF: JAJT

SUBJECT: Detailing Military Judges to Courts–Martial

TO: ALL MILITARY JUDGES

1. By the authority vested in me by R.C.M. 503(b), Manual for Courts–Martial, 1984, and paragraph 8–2, AFR 111–1, dated 30 September 1988, each of you is delegated the authority to detail yourself or any other Air Force military judge to courts-martial tried in your judicial circuit. Normally, however, the chief circuit military judge for the circuit in which the case is to be tried will exercise this detailing authority.

2. Orders detailing military judges may be oral, written or in message form. Written orders or messages should be included in the record of trial. Oral orders shall be announced orally on the record at the court-martial.

/s/ James E. Heupel

JAMES E. HEUPEL, Colonel, USAF

Chief Trial Judge

USAF Trial Judiciary

Office of The Judge Advocate General